UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PT. BANK NEGARA INDONESIA
(PERSERO) TBK,

                        Plaintiff,

          v.

BARCLAYS BANK PLC et al.

                        Defendants.

10 Civ. 8851 (LBS)

**MEMORANDUM
& ORDER**

SAND, J.

       Plaintiff PT. Bank Negara Indonesia (Persero) Tbk. ("BNI") brings this action against Defendants, Barclays Bank PLC ("Barclays") and Barclays Capital Inc. ("BCI"), for losses it sustained after a credit-linked note it purchased from Defendants lost more than half its value due to the bankruptcy of one of the corporate entities to which it was linked.  BNI claims Defendants are liable for these damages because they initially defrauded it into buying the note, in violation of §10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as well as the common law torts of fraud in the inducement and negligent misrepresentation.  BNI also brings a number of fraud and breach of contract claims against Defendants for actions they took subsequent to the sale of the credit-linked note.   Defendants move to dismiss all the claims against them.  For the following reasons, Defendants' motion is granted.

       **I.    Background**

       BNI is a state-owned commercial bank that periodically invests in U.S.-based securities via its agency in New York.  First Am. Compl. ("FAC") ¶ 11, 49.  On August 25, 2006,  BNI purchased a $5 million dollar credit-linked note ("CLN") from Barclays.  Barclays' U.S.

1

subsidiary, BCI, negotiated the transaction and acted as its agent on the deal.  FAC ¶¶ 62-66.  The note was a contingent principal security, which means that interest payments on the note, and its value upon maturity, depended upon the creditworthiness of the corporation to which it was linked (what in the CLN's contractual language was called a "Reference Entity").  FAC ¶¶ 43-44.  If the corporation thrived, so did the note holders. However, if the corporation did poorly, or suffered what the contractual language described as a "Credit Event" (such as bankruptcy, default, or restructuring), investors could receive less on their investment, or nothing at all.  *Id.*

The Reference Entity of the CLN that BNI bought from Defendants was identified in the Term Sheet that accompanied the sale as "Verizon and any Successors."  FAC ¶ 54.  BNI alleges that it bought the CLN because it knew that Verizon was a stable corporation, rated by the credit agencies as "investment grade."  FAC ¶¶ 1, 19.  What it claims it did not know when it bought the note was that Verizon was about to spin off its Information Services division to create an independent company, Idearc, and that the Reference Entity to which BNI's CLN was linked would change as a result, so that 50% of the value of the note would now be linked to the creditworthiness of the new company, rather than Verizon.  FAC ¶¶ 73–74.

BNI alleges that, in inducing it to buy the CLN, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),  as implemented by SEC Rule 10b-5,  and committed fraud in the inducement or negligent misrepresentation by purposefully failing to disclose the material, nonpublic knowledge they possessed at the time of the sale about the spin-off, and its possible impact on the value of the note.  FAC ¶¶ 127–159.  BNI also alleges that Defendants subsequently engaged in common law fraud and breach of contract by failing to disclose to BNI that a "Succession Event" had occurred and that, as a result, the CLN was now 50% linked to

Idearc, not Verizon.[1]  FAC ¶¶ 160-172, 179–204.  It seeks $2.5 million in damages from Defendants or, in the alternative, a declaratory judgment from the Court declaring Verizon to be the only Reference Entity linked to BNI's CLN and directing Barclays to pay $5 million to BNI upon the maturation of the note, plus all accrued and unpaid interest.  FAC ¶ 211.

Defendants move to dismiss all claims, on both substantive and jurisdictional grounds.

II. **Standard of Review**

On a motion to dismiss, a court reviewing a complaint will consider all material factual allegations as true and draw all reasonable inferences in favor of the plaintiff.  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through 'factual allegations sufficient to raise a right to relief above the speculative level.'"  *ATSI Commc'ns Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 93 (2d Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 ( 2009).   Rather, the plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face."  *Iqbal*, 129 S. Ct. at 1940 (citing *Twombly*, 550 U.S. at 570).

Allegations of fraud must meet the heightened pleading standard of Rule 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud."  Fed. R.

---

[1]  A "Succession Event" is defined by the Credit Derivatives Definitions ("CDDs"), produced by the International Swaps and Derivatives Association and incorporated into the Barclays CLN, as "an event, such as a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event in which one entity succeeds to the obligations of another entity."  CDD § 2.2 (b).  A Succession Event thus occurs whenever one entity succeeds to the debt obligations of another.  According to the CDDs, however, this Event has implications for the reference structure of a credit-linked note only when the new entity ("the Successor") takes on more than 25% of the parent's debt.  CDD §  2.2 (a).  It was thus because Idearc inherited more than 25% of Verizon's debt obligations, as calculated by Barclays (who was designated as the "Calculation Agent" for the note, FAC ¶ 57) that the spin-off triggered a change in the reference structure of the Barclays CLN.

Civ. P. 9(b).  The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).  "[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.  An ample factual basis must be supplied to support the charges." *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991) (internal citations omitted).

### III.  Discussion

#### A.  The 10b-5 Claim

To succeed on a SEC Rule 10b-5 claim, a "plaintiff must establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'" *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quoting *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 161 (2d Cir. 2000)).  BNI claims that Defendants both actively misrepresented and committed a wrongful omission when it sold the CLN to BNI and that it acted with scienter when it did so, in order to help Verizon "unload" its debt.  FAC ¶ 2.  Defendants move the Court to dismiss BNI's 10b-5 claim for failing to establish, with the particularity required by Fed. R. Civ. P.  9(b), that Defendants either actively misrepresented or willfully omitted material information about the CLN at the time of sale.  We agree that BNI fails to establish a plausible claim of either misrepresentation or wrongful omission and grant Defendants' motion.

*i. The Misrepresentation Claim*

4

BNI alleges that Defendants actively misrepresented the nature of the CLN in two ways: first, by actively asserting that the CLN would be linked to Verizon and Verizon alone; second, by leading BNI to believe that the note was a conservative investment with a low risk of default, like the "investment grade" notes BNI typically purchased.  As evidence of the first misrepresentation, it cites the statement that Jonathan Lum, an employee of BCI in New York, allegedly made to Mohamed El-Shazly, Deputy General Manager of BNI's New York agency, sometime in 2006, in which Mr. Lum told Mr. El-Shazly that the CLN would be linked to Verizon.  FAC ¶ 51.  As evidence of the latter misrepresentation, it points to the low interest rate Defendants provided for the CLN, and argues that, because low interest rates typically accompany investment grade derivatives, the rate of interest actively misrepresented the risk associated with what was in fact an unrated note.  FAC ¶ 89.

Neither Mr. Lum's statement to Mr. El-Shazly, nor the low rate of interest earned by the CLN, suffice to establish a plausible claim of misrepresentation.   Mr. Lum's statement to Mr El-Shazly, although potentially misleading in its failure to indicate that the note could be linked to Verizon successors, not Verizon alone, was not the only representation Defendants made to BNI about the CLN prior to the sale.  In fact, immediately after Mr. Lum spoke with Mr. El-Shazly, he sent BNI multiple documents that clearly stated that the Reference Entity of the note would be "Verizon and any of its successors."  FAC ¶ 89; Harlow Decl. Exs. C, F.  The fact that the documents provided to BNI prior to sale clearly and on multiple occasions stated that Verizon was not necessarily the only Reference Entity for the note means that when "taken together and in context," Defendants' representations about the reference entity of the CLN do not appear to have been materially misleading.  *See In re Britannia Bulk Holdings Inc. Secs. Litig.,* 665 F. Supp. 2d 404, 412-414 (S.D.N.Y. 2009).  ("The central issue [in determining whether

5

misrepresentation occurred] is not whether the particular statements, taken separately, were literally true, but whether a defendant's representations, taken together and in context, would have misled a reasonable investor about the nature of the securities.")

The same is true of the interest rate. While the low interest rate might conceivably have led BNI to believe they were purchasing an investment grade security, the sale documents—including the Term Sheet and Supplement to the Information Memorandum—made clear that they were instead purchasing an unrated note. Harlow Decl. Exs. A at 11, F. The documents also extensively discussed the risks associated with purchase. Harlow Decl. Ex A. As such, even if the interest rate could be understood as a misleading misrepresentation, it was not one that was material. Without materiality, BNI's misrepresentation claim fails.

### ii. The Material Omission Claim

BNI's material omission claim also fails to satisfy the pleading standards required by Fed. R. Civ. P. 9(b). Under Rule 9(b), "allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge," as is the case here. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). In such cases, however, a plaintiff is still required to "adduce specific facts supporting a strong inference of fraud." *Id.* Plaintiffs have not adduced any specific facts to support a strong inference of fraud.

In particular, they have not demonstrated that Defendants intentionally withheld information that was in their possession at the time of the sale. BNI claims that Defendants "had to have known" details of the spin-off prior to their public disclosure, and knew or should have known that the spun-off entity would be a financially risky company, and that this would affect the creditworthiness of the CLN. FAC ¶ 83. To support the claim that Defendants had to have known details about the spin-off at the time of sale, they cite a number of facts: that, at the time

of sale, Defendants owned more than 5% of the equity interest in Verizon, and could therefore be considered Verizon "insiders"; that Defendants loaned money to Idearc when it was spun off from Verizon and acted as a documentation agent on a credit agreement Idearc entered into in November, 2006; and that Defendants had a pre-existing working relationship with Verizon. FAC ¶¶ 20-27, 75, 80-81.

These facts make clear that, as of November, 2006, Defendants knew about the spin-off and sufficiently trusted in the creditworthiness of Idearc to loan it money. They do not, however, establish with particularity that at the time of the CLN's sale, in August, 2006, Defendants possessed any more information about the spin-off than what was publicly available. Indeed, BNI provides no allegations, or factual support, to explain more specifically how Defendants would have acquired this knowledge from Verizon at the time of sale. Nor does it provide evidence, or arguments, demonstrating how Barclay's status as a Verizon insider translated into its receipt of insider knowledge about the spin-off.

Because BNI fails to state a plausible claim for either material misrepresentation or omission in violation of SEC Rule 10-b(5), Plaintiff's claim under §10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), is dismissed with prejudice.

### B. The State Law Claims

In addition to the federal securities claims, BNI brings a number of state law claims against Defendants, including two common law fraud claims, a claim of negligent misrepresentation, three breach of contract claims, and a promissory estoppel and declaratory judgment claim. We need not reach the merits of these claims, however, given the dismissal of the federal securities claim, which serves as the only source of federal jurisdiction in this case.

Defendants argue that because BNI's state law fraud claims and its negligent misrepresentation claim raise "virtually identical" allegations to the federal securities claim, we should exercise supplemental jurisdiction over these claims, and dismiss them for the same reasons as the 10b-5 claim. Defs. Memo Supp. Mot. Dismiss, at 27. We refuse to do so, however. The decision to exercise supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(c) is a discretionary one, within the power of the district court. *See Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 215 (2d. Cir. 2004). In a case such as this, where "all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

We thus decline to exercise supplemental jurisdiction over any of BNI's state law claims and dismiss them without prejudice, pursuant to 28 U.S.C. § 1367(c).

### IV. Conclusion

Defendants' motion to dismiss is granted. Accordingly, Count One of Plaintiff's First Amended Complaint is dismissed with prejudice. Counts Two through Eight are dismissed without prejudice for lack of jurisdiction.

SO ORDERED.

Dated: September 28, 2011
New York, NY

_____
U.S.D.J.

8